**NONPRECEDENTIAL DISPOSITION**
To be cited only in accordance with
Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued March 2, 2010
Decided April 16, 2010

**Before**

DIANE P. WOOD, *Circuit Judge*

ANN CLAIRE WILLIAMS, *Circuit Judge*

DAVID F. HAMILTON, *Circuit Judge*

No. 09-2696

| | |
|---|---|
| BARBARA SUIDE, | Appeal from the United States District |
| *Plaintiff-Appellant,* | Court for the Northern District of Illinois, Eastern Division. |
| *v.* | |
| | No. 1:08-cv-02967 |
| MICHAEL J. ASTRUE, | |
| Commissioner of Social Security, | Charles R. Norgle, |
| *Defendant-Appellee.* | *Judge.* |

**O R D E R**

Barbara Suide applied for disability insurance benefits and supplemental security income in December 2003. She claimed at the time that she had been disabled after October 2000 due to bilateral carpal tunnel syndrome, arthritis, and "trigger finger" (an inflamed tendon and tendon sheath of a finger). But the case changed substantially by the time an administrative law judge conducted a hearing in December 2007. By then Suide had suffered two strokes and had filed a second application for benefits that added several more medical conditions to her list of disabling impairments. The ALJ concluded that Suide was impaired by carpal tunnel, trigger finger, stroke, migraines, and obesity but that she was still able to perform some light or sedentary work. On judicial review, the district court affirmed. On appeal Suide argues principally that (1) the ALJ's assessment of her residual functional capacity

was flawed because it did not account for all of her impairments and (2) the ALJ should not have discredited the opinions of her treating physician. Although substantial evidence supports the ALJ's determination that Suide was not disabled before her first stroke, the record is insufficient to sustain the ALJ's findings about her residual functional capacity determination after her strokes. We therefore remand the case to the Commissioner for further proceedings to determine whether Suide qualifies for benefits after her stroke in December 2006.

When she applied for disability insurance benefits and supplemental security income in December 2003, Suide was 37 years old and had worked previously as a mail clerk and K-Mart cashier. In support of her claim, Suide submitted evidence of right-hand carpal tunnel syndrome and trigger finger, which required two surgeries to alleviate her pain and to remove part of a tendon from her right hand. She continued to complain of pain, tenderness, and stiffness in her hands and was later diagnosed with left carpal tunnel syndrome. Her diagnosing doctor instructed her to wear a wrist brace when necessary, but the doctor also noted that some of Suide's complaints were atypical of carpal tunnel, such as numbness in isolated fingers, and that it was unusual for Suide to have still a full range of motion and normal electromyography. Suide also submitted evidence that she had a third surgery to remove a cyst from her right hand in October 2004. The treatments for her hands and wrists appear to have been successful, and her doctors noted improvements in her grip strength and an absence of pain, numbness, and tingling.

Suide's initial application for benefits also referenced complaints of knee pain and stiffness. X-rays taken in January 2003 showed signs of degenerative arthritis—a diagnosis that was consistently noted in her medical records until 2007, when a rheumatologist determined that lupus might be the real cause of her joint pain. Although at the hearing Suide testified about the extent of her knee pain and its significant limitation on her mobility, there is little documenting the effects of her pain or her treatment plan other than occasional notations of her pain complaints in the medical reports and the fact that she took glucosamine and over-the-counter pain medications. In addition, the record includes a few notations of Suide's height and weight measurements, suggesting that she qualifies as "obese," but there is no medical evidence that her weight complicated her joint pain. She did not mention her weight in either her first or second applications for benefits, nor did she bring up the subject before the ALJ.

In April 2004, several months after Suide applied for benefits, a state-agency physician assessed her residual functional capacity. The doctor, B. Rock Oh, concluded that Suide could lift up to 50 pounds occasionally and 25 pounds frequently. He also concluded that she could stand, walk, or sit each for approximately six hours per day. Dr. Oh opined that Suide's grip strength was decreased in both hands, which inhibited manipulation as well as constant handling and fingering.

Suide had been working for several months babysitting her neighbor's children when she learned that the Social Security Administration denied her claim and her request for reconsideration in 2004. The SSA determined that Suide's carpal tunnel, trigger finger, and arthritis did not limit her ability to work. Suide requested a hearing before an ALJ, which was eventually scheduled for December 11, 2007, after being rescheduled several times due to Suide's failure to appear. Meanwhile, Suide stopped babysitting when the family moved away in mid-2004, but she went back to work as a K-Mart cashier in May 2006.

Suide was still working at K-Mart when she suffered a stroke in December 2006 – a year before her hearing and shortly before her insured status expired at the end of that year. She was taken to the emergency room where doctors noted severe face droop, left-side motor weakness, and slurred speech. Hospital doctors suspected, however, that Suide was exaggerating her sensory motor deficits, making it difficult to assess her condition. Suide tested positive for cocaine, and the hospital doctors noted cocaine abuse as a secondary diagnosis and as a possible cause of her stroke. Suide later explained at the hearing that she had used the drug for the first and last time approximately five days before her stroke.

Suide did not return to work, and she began physical therapy in February 2007. Progress notes from her therapists show that her left-side weakness caused balance problems and difficulty walking. Suide reported to her physical therapist that she was unable to walk even one block without significant pain. One therapist observed that Suide was not at risk of falling due to her pain but was walking with a significant limp, and she suffered from decreased balance and coordination.

In March 2007 a second state-agency consultant, Dr. Linda Palacci, examined Suide. Dr. Palacci's examination encompassed a limited physical examination, a review of Suide's medical records, and a discussion of her symptoms, but no formal RFC evaluation. Dr. Palacci noted that Suide complained of left leg weakness, and that she was wearing an ankle brace and walking with a cane to help with her foot drag. Suide reported morning stiffness lasting longer than an hour and that her symptoms worsened with activities such as stair climbing. Dr. Palacci concluded that Suide had normal range of motion in her knees, ankles, hips, shoulders, elbows, wrists, and fingers, and that her grip strength was good in both hands. Dr. Palacci noted that Suide still walked with a slight limp and could walk only 10 feet without assistance, but that she was able to squat and stand heel to toe.

The physical therapy helped, though, and Suide was making progress toward her goals when she suffered two more setbacks. In April 2007 she was admitted to the emergency room after experiencing a sudden onset of uncontrolled shaking in her right hand and difficulty talking, which the doctors diagnosed as a minor stroke. The result of a CT-scan of her head was normal, and a neurological examination showed some right-side weakness right after the

stroke, but the record does not show what, if any, long-term effects she experienced. In May 2007 her condition was exacerbated by a fall that injured her right hip. Although Suide had been using a cane, her physical therapist instructed her to switch to a walker after her fall to relieve the pain and pressure on her hip. By the end of her physical therapy that same month, Suide had partially met her goals of demonstrating improved strength, but the physical therapist noted that she had not met her goal of walking unassisted without a limp for one block without experiencing significant pain.

At the hearing before the ALJ, Suide testified that from January through September 2007 she also had made monthly visits to Dr. Orris, an attending physician at Stroger Hospital's Fantus Clinic in Chicago. Given the structure of the clinic, Suide concedes that Dr. Orris himself may not have examined her during each visit, but she insists that he was her treating physician and the doctor overseeing and coordinating her post-stroke medical care. Treatment records from Dr. Orris are sparse, and there is documentation of just one office visit – in May 2007 – that occurred prior to Suide's hearing. The remainder of Dr. Orris's treatment record consists of two documents listing him as the treating physician on referrals and a physical-capacities evaluation that was created by Suide's attorney and completed by Dr. Orris in December 2007, after the hearing. During the May examination, Dr. Orris opined that Suide suffers from rheumatoid arthritis and residual transient weakness from her 2006 stroke. He also diagnosed "probable migraine syndrome possibly triggered by stress." In the post-hearing physical-capacities evaluation (completed three months after Suide's last reported visit in September), Dr. Orris concluded that – in an eight-hour day – Suide could sit for two hours at a time (but only four hours total), stand for one hour at a time (two hours total), and walk a total of one hour. He also opined that she could never lift or carry more than ten pounds, and could lift or carry less weight only occasionally. Dr. Orris found that Suide could not use her left hand for repetitive action involving simple grasping, pushing or pulling, or either hand for fine manipulation. While Suide occasionally could bend, squat, crawl, climb, or reach, she could never use either of her feet for repetitive movements, such as pushing leg controls. Dr. Orris concluded that Suide had achieved "maximum medical improvement" and that she was unable to perform a full-time job on a sustained basis. The evaluation form also asked, "How long have you been treating this patient?" to which Dr. Orris responded "1 month."

Suide also testified that she was unable to work because her joints caused her pain that lasted all day. She also acknowledged that she had not had any treatment for her hand pain since her last surgery in 2004 and was without a treating physician between 2003 and 2007, when she began seeing Dr. Orris. She acknowledged that she was not taking any pain medications, but explained that her hand pain persisted and in the mornings she self-treated these symptoms by massaging her hands for 20 minutes. She explained that Dr. Orris had also recently diagnosed her with migraine syndrome based on the severe headaches she experiences two to three times per month. When these headaches occur, she said, she addresses them with

Valium and sleep. The ALJ asked Suide about the effects of her pain on her daily activities, and she explained that she gets a lot of help from her family. She also testified that it hurts for her to grip a mop or a broom, that she can sit or stand for only five to ten minutes before she has to change positions or lean on something for support, and that her knee and hip pain prevent her from walking more than half a block before stopping. During the hearing Suide said that she was in pain and requested a break to stand.

The ALJ and Suide's counsel posed hypothetical questions to a vocational expert, who testified that someone with Suide's age, work history, and impairments still could perform the light work of a file clerk, an information clerk, or an assembly position and similar sedentary positions. The vocational expert determined that these jobs would be available if the employee needed to take breaks to stand every 30 to 45 minutes. Counsel further inquired what jobs an individual could perform if she needed to recline for 15 to 30 minutes a day, use both hands to lift more than ten pounds, lean after five to ten minutes of standing, and take a break after walking no more than half a block. In response the vocational expert testified that any individual who needed to recline at times throughout the work day would be unable to work.

The ALJ performed the requisite five-step analysis, see 20 C.F.R. § 404.1520, concluding that (1) Suide had not engaged in gainful work since October 2000; (2) her carpal tunnel, trigger finger, stroke, migraines, and obesity constituted severe impairments; (3) none of these impairments individually or in combination met a listing in 20 C.F.R. pt. 404, subpt. P, app.1 that would lead to an automatic finding of disability; (4) Suide had the residual functional capacity to perform a reduced range of light or sedentary jobs that involve no lifting or carrying more than 20 pounds occasionally or 10 pounds frequently; no pushing or pulling more than 20 pounds occasionally or 10 pounds frequently; only occasional stooping, kneeling, crouching, crawling, or ramp/stair climbing; and at which "[s]he would be distracted only rarely by symptoms, to the extent that she was off task and not productive, outside break time"; and (5) Suide was not disabled because a person of her age, education, work experience, and RFC could perform a significant number of jobs in the national economy.

In making this determination, the ALJ did not give significant weight to Dr. Orris's evaluation because, according to Dr. Orris's own post-hearing report, he had been treating Suide for just one month and because "the objective findings do not support [his] restrictive limitations." The ALJ also discredited the residual functional capacity assessment that Dr. Oh completed in April 2004 because Suide's later strokes had significantly changed her medical condition and further limited her abilities. Regarding Suide's post-stroke condition, however, the ALJ found: "Though the claimant may have been unable to stand and walk for prolonged periods immediately after her stroke, she underwent physical therapy and her weakness did not persist at that level for 12 consecutive months or more" and that her weakness had improved to the point where "she should be able, in a typical work day with normal breaks,

to stand and walk for at least six hours." The ALJ found that the record did not support Suide's statements regarding the severity and effects of her conditions. For example, the ALJ concluded that there was insufficient evidence that Suide experienced "migraine headaches at a frequency or severity which would preclude or even significantly interfere with competitive employment." The ALJ also dismissed Suide's rheumatoid arthritis and lupus diagnoses, reasoning that the "record does not contain the objective findings leading to the diagnosis of rheumatoid arthritis," there was no "meaningful workup" of her lupus, nor did Suide complain of symptoms attributed to this condition. The district court upheld the ALJ's denial of benefits, and this appeal followed.

On appeal Suide argues that the ALJ erred in discrediting Dr. Orris's opinion because her own testimony and her medical records demonstrate that Dr. Orris had been treating her for much longer than one month, and that his post-hearing evaluation was consistent with other findings in the record. She also contends that the ALJ's residual functional capacity finding was flawed because it did not sufficiently account for her hand impairments, migraines, and obesity. In response, the Commissioner argues that the ALJ's decision is supported by substantial evidence and that Suide's statements are the only evidence of a longer treatment relationship with Dr. Orris. Moreover, the Commissioner contends that the ALJ properly considered her hand impairments, migraines, and obesity but found that none of these conditions sufficiently limited her ability to work. This court reviews an ALJ's legal determinations de novo, *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007), but reviews factual determinations deferentially, upholding any decision that is supported by substantial evidence, *Getch v. Astrue*, 539 F.3d 473, 480 (7th Cir. 2008).

Because Dr. Orris concluded that Suide was no longer able to work, the weight given to his opinions may be decisive in this case. Both parties focus their arguments on the soundness of the ALJ's decision to discount his reports. The opinions of treating physicians are generally entitled to greater weight than those of examining physicians, and opinions of examining physicians are entitled to greater weight than those of non-examining physicians. 20 C.F.R. § 416.927(d)(1) - (2). As long as a treating physician's opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and is "not inconsistent with other substantial evidence" in the case record, the ALJ should give it controlling weight. *Id.*; S.S.R. 96-2p; see *Bauer v. Astrue*, 532 F.3d 606, 608 (7th Cir. 2008). According to Suide, the ALJ erred in dismissing Dr. Orris's physical-capacities evaluation from December 2007 because that evaluation was consistent with other post-stroke reports. Moreover, Suide argues that the ALJ should have realized that the "one month" span of treatment described by Dr. Orris in his post-hearing report was a mistake and that her testimony in conjunction with the handful of pages in the record referring to Dr. Orris sufficiently called attention to the discrepancy. Citing cases describing an ALJ's obligation to develop the record, Suide argues that, before reaching a decision, the ALJ was required to request further documentation to resolve this record

conflict. In response, the Commissioner counters that the sparse medical records are not what one would expect from the treating relationship Suide described; aside from the December 2007 evaluation, the records are limited to the one visit in May 2007 plus the appearance of his name on the referrals. And those referrals, the Commissioner insists, imply only that "his final authorization was necessary for requests made by other doctors" at the clinic. The Commissioner also asserts that there is substantial evidence to show that Suide had significantly improved after physical therapy to a point where she was not as restricted as Orris suggested.

But it is not the ALJ's evaluation of Dr. Orris's reports that requires a remand in this case. Even assuming that Dr. Orris's opinions did not deserve greater weight, it is the evidentiary deficit left by the ALJ's rejection of his reports – not the decision itself – that is troubling. The rest of the record simply does not support the parameters included in the ALJ's residual functional capacity determination, such as an ability to "stand or walk for six hours" in a typical work day. Without Dr. Orris's opinions, Dr. Palacci's evaluation and the notes from Suide's physical-therapy sessions and her visits to other specialists are all that remain of the post-stroke medical records. The ALJ, however, did not discuss what weight was given to any of these reports. See *Craft v. Astrue*, 539 F.3d 668, 676 (7th Cir. 2008). More important, Dr. Palacci's assessment was made before Suide suffered a second stroke and more injuries from a fall – two events that may have changed Suide's condition significantly. In addition, Dr. Palacci's evaluation did not include a *functional* assessment of Suide's abilities, nor did she opine about any limitations Suide's impairments may have caused, so her report could not be used to support specific limitations included in Suide's residual functional capacity. Regarding the physical-therapy reports, the therapist noted that, although Suide had improved and her strength was within functional limits by the time of her last visit in late May 2007, she still walked with a limp and the assistance of a cane, had "decreased balance/coordination," and "difficulty with activities of daily living." It is unclear, therefore, how the ALJ concluded that Suide could stand or walk for six hours a day. See *Barrett v. Barnhart*, 355 F.3d 1065, 1066-67 (7th Cir. 2004) (finding reversible error when ALJ determined that claimant could stand for two hours because there was no medical evidence to support such a conclusion).

When an ALJ denies benefits, she must build an "accurate and logical bridge from the evidence to her conclusion," *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000), and she is not allowed to "play doctor" by using her own lay opinions to fill evidentiary gaps in the record, see *Blakes v. Barnhart*, 331 F.3d 565, 570 (7th Cir. 2003). Although Suide shares the blame for failing to clarify the record discrepancy regarding the length of Dr. Orris's treatment, it was the ALJ's responsibility to recognize the need for further medical evaluations of Suide's conditions before making her residual functional capacity and disability determinations. See *Golembiewski v. Barnhart*, 322 F.3d 912, 918 (7th Cir. 2003) (remanding where ALJ ignored new medical issue but should have sought more information); *Smith v. Apfel*, 231 F.3d 433, 437 (7th Cir. 2000)

(remanding where ALJ discounted severity of claimant's arthritis without ordering updated x-rays); *Murphy v. Astrue*, 496 F.3d 630, 635 (7th Cir. 2007) (remanding where ALJ failed to obtain additional records needed for medical expert to provide full and fair evaluation of impairments). The ALJ's assessment of Suide's post-stroke residual functional capacity is not supported by substantial evidence, and thus that determination cannot stand. 42 U.S.C. § 405(g); *Briscoe v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005)*.*

Although a remand is necessary, we reverse the ALJ's decision only in part. As the parties noted and the ALJ explained, Suide's condition significantly deteriorated after her stroke in December 2006, and this date marked a dividing line in her claim. Suide properly conceded during oral argument that the ALJ's denial of benefits was reasonable and well supported for her condition up to the time of the first stroke. We agree that the record supports the ALJ's denial of her disability claim from her alleged onset date of October 2000 through the date of her first stroke. Therefore, we affirm in part, reverse in part, and remand for further proceedings to determine whether Suide qualifies for benefits after December 2006. Because we conclude that the ALJ's residual functional capacity determination was flawed, we do not need to address Suide's related arguments regarding the ALJ's assessment of her hand impairments, her migraines, and her obesity and whether these conditions, either individually or in the aggregate, warranted the inclusion of additional limitations in her residual functional capacity. On remand, the ALJ should give fresh consideration to the evidence of all of Suide's medical conditions as they relate to her disability claim beginning in December 2006. Suide should also have an opportunity to submit any additional documentation relating to Dr. Orris's treatment that can clarify the nature and extent of his treating relationship.

Accordingly we AFFIRM in part, REVERSE in part, and REMAND for further proceedings consistent with this opinion.